```
                                                      Page 1

 1         IN THE UNITED STATES DISTRICT COURT
 2         FOR THE SOUTHERN DISTRICT OF INDIANA
 3
     PEOPLE OF THE ETHICAL    )
 4   TREATMENT OF ANIMALS,    )
     INC.,                    )
 5                            )
              Plaintiffs,     )  No. 4:17-CV-00186-RLY-DML
 6                            )
         vs                   )
 7                            )
     WILDLIFE IN NEED AND     )
 8   WILDLIFE IN DEED, INC.,  )
     TIMOTHY L. STARK,        )
 9   MELISA D. STARK AND      )
     JEFF LOWE,               )
10                            )
              Defendants.     )
11
12
13       The ZOOM VIDEOCONFERENCE deposition of
14                JEFFREY LOWE
15   called for examination pursuant to notice and
16   pursuant to the Federal Rules of Civil Procedure for
17   the United States District Courts pertaining to the
18   taking of depositions taken before JO ANN LOSOYA,
19   Certified Shorthand Reporter, within and for the
20   County of Cook and State of Illinois via ZOOM
21   VIDEOCONFERENCE on May 27, 2020 at the hour of 9:00
22   a.m. CST.
23
24
25
```

```
 1    APPEARANCES VIA ZOOM:
 2         PETA FOUNDATION
           MR. ASHER SMITH
 3         MR. GARBRIEL WALTERS
           MS. CAITLIN HAWKS
 4         MS. BRITTANY PEET
           1536 16th Street NW
 5         Washington DC 20036
           (202) 483-7382
 6         ashers@petaf.org
           Gabew@petaf.org
 7         caitlinh@petaf.org
 8         BARNES & THORNBURG, LLP
           MR. PAUL OLSZOWKA
 9         One North Wacker Drive
           Suite 4400
10         Chicago,Illinois  60606
           (312) 357-1313
11         paul.olszowka@btlaw.com
                Appeared on behalf of PETA.
12
                  * * * * * * * * * * * * * * * *
13
           CULOTTA LAW
14         MR. JAMES CLAYTON CULOTTA
           815 East Market Street
15         New Albany, Indiana 47150
           (812) 941-8886,
16         clay@culottalaw.com
                Appeared on behalf of the Defendant
17              Wildlife in Need and Wildlife in Deed;
                Tim Stark.
18
                  * * * * * * * * * * * * * * * *
19
      ALSO PRESENT VIA ZOOM:
20
           Ms. Jessica Amin
21         Mr. Tim Stark
           Mr. Ira Livingston
22
23
      REPORTED BY:   JO ANN LOSOYA
24    CSR LICENSE:   084-002437
25
```

```
 1                       EXAMINATION
 2    Witness                                    Page    Line
 3    JEFFREY LOWE
 4      By Mr. Smith                              4       7
 5
 6                    * * * * * * * * * * * * * *
 7                     INDEX OF EXHIBITS
 8    EXHIBIT            DESCRIPTION                      PAGE
 9    Exhibit 1   Letter from Tim Stark                      9
10    Exhibit 2   Email                                     12
11    Exhibit 3   Facebook post                             17
12    Exhibit 4   Facebook post                             19
13    Exhibit 5   Facebook post                             36
14
15
16
17
18
19
20
21
22
23
24
25
```

1      A.   He had an open trailer with heavy
2   equipment on it.
3      Q.   Does this jog your memory as to whether
4   the cubs were transported in the open trailer or in
5   the -- say on the seat?
6      A.   I don't remember.  I don't remember.  I
7   actually don't even think I saw him take them from
8   the car or from the truck.  I think by the time I
9   walked out there, they were sitting on the ground in
10  a carrier.
11     Q.   Earlier we saw that Mr. Stark represented
12  that these cubs were delivered to your zoo on
13  August 12, 2019.  Do you have any recollection as to
14  what the weather may have been in August of 2019?
15     A.   I have no idea, but I would assume it was
16  hot.
17     Q.   If I represented to you that according to
18  a Google search, temperatures of at least 100
19  degrees were reported on August 12, 2019, in central
20  Oklahoma.  Would that surprise you?
21     A.   No.  That's our Oklahoma's weather in
22  August typically.
23     Q.   Do you remember what condition the cubs
24  were in when they arrived?
25     A.   They were very, very small, and just

1   huddled together.  I brought them in and let my wife
2   start taking care of them.
3       Q.   Did they show any negative effects from
4   their transport?
5       A.   I'm not a vet.  I don't know what caused
6   their negative effects.
7       Q.   Earlier you told me that a number of
8   animals Tim Stark delivered to your facility were
9   half dead.  What did you mean by half dead?
10      A.   Say that again, please.
11      Q.   What did you mean when you told me that
12  some of the animals Tim Stark transported to your
13  zoo were half dead?
14      A.   They were near death or dead.
15      Q.   And how did you reach that conclusion?
16      A.   Because I have known animals since I was
17  six years old and I'm 55 years old.
18      Q.   In what way would they have looked half
19  dead?
20      A.   Half of them were -- well, 28 or 30 were
21  already dead, and the others were close to death
22  from dehydration.
23      Q.   Do you remember if these lions showed any
24  signs of dehydration?
25      A.   No.  Because as I said, those lions

```
 1   weren't in this trailer of death.
 2        Q.   After Tim Stark arrived, did he ever ask
 3   you to claim that they were born at your zoo?
 4        A.   No, not that I remember.  Actually, he
 5   might have.  I don't remember.  We had so many
 6   conversations about so many things over the period
 7   of a few months that I don't remember.
 8        Q.   If we scroll up on the exhibit on the
 9   screen now, you would find that you wrote:  "Not to
10   mention July 17 to 18, Tim Stark pulled five newborn
11   cubs against a federal court order and asked me to
12   claim they were born at my park."
13             Is it your testimony that that's
14   accurate and that he asked you to claim that they
15   are born at your park?
16        A.   If that's what I said then, then that's
17   what happened.
18        Q.   You also state here that Tim pulled five
19   newborn cubs.  Do you know where you got the
20   number 5 from?
21        A.   I don't know.
22        Q.   When he arrived, did he have four cubs or
23   five cubs?
24        A.   Apparently from what I'm being reminded,
25   one died at his facility before he brought it here.
```

1  Q. Who reminded you of that?
2  A. My wife.
3  Q. Is your wife next to you right now?
4  A. She is.
5  Q. When you say that one died -- I'm sorry.
6  Let me look.
7      When you say one died at his facility
8  before he brought it here, how do you know that?
9  A. If I said it, it would have been just
10 relaying what Stark told us. That's the only way I
11 could have known.
12 Q. Do you have any recollection that Tim
13 told you that one cub died at his facility before
14 being transported to Oklahoma?
15 A. I vaguely remember it but nothing
16 specific.
17 Q. Do you have any recollection how or why
18 this cub may have died?
19 A. I would have no idea.
20 Q. I'd like to ask you about the living
21 situation of these four lions now that you're -- now
22 that they're at your zoo.
23      Do you know what their names are
24 currently that you or your staff identify them by?
25 A. No.

Page 28

```
 1      Q.    Have any of these four lions had any
 2   medical issues since August 12, 2019?
 3      A.    That's also none of your business.
 4   Protected by HIPAA.
 5      Q.    Is it your testimony that HIPAA protects
 6   big cats?
 7      A.    Yes.  It protects my medical records and
 8   those are my medical records.
 9      Q.    Has a veterinarian treated any medical
10   issues for these big cats since August 2019?
11      A.    Again, that's protected information.
12      Q.    Have these big cats been consistently
13   healthy since they arrived at your facility?
14      A.    Everything here is healthy now.
15      Q.    Have any of these lions been declawed?
16      A.    No.
17      Q.    Have you ever had a big cat cub declawed?
18      A.    No.
19      Q.    Why not?
20      A.    I do not declaw big cats.
21      Q.    Do you consider it inhumane?
22      A.    I consider it unnecessary.
23      Q.    Why is it unnecessary?
24      A.    Because I just don't believe that you
25   maim an animal because you're afraid of that animal.
```

```
 1         Q.    Okay.  How many other big cats have
 2   access to that exercise area?
 3         A.    What does that matter?  Several.  Maybe
 4   10, 12, 15.  But those aren't the lions that were
 5   the scope of this deposition.
 6         Q.    Are groups of big -- are different groups
 7   of big cats from different enclosures ever rotated
 8   through that area at the same time?
 9         A.    Are what?
10         Q.    Are different groups of big cats from
11   different enclosures ever rotated into the exercise
12   area at the same time?
13         A.    No.
14         Q.    Does your zoo have a formal written lion
15   or big cat nutrition plan?
16         A.    Yes.
17         Q.    Who put together that plan?
18         A.    We did.
19         Q.    Who is we?
20         A.    We -- we -- the people here at the zoo
21   who do it every single day.  You have already filed
22   a FOIA request for all of this from the USDA because
23   I got the notice.
24         Q.    Is this a document that you keep at your
25   facility?
```

Page 39

```
1        A.    Nope, I keep it in my home.
2        Q.    Does your zoo have a formal written lion
3   or big cat nutrition plan?
4        A.    Yes, we do.
5        Q.    Are these --
6        A.    You just -- you just FOIA requested it
7   from the USDA.  You know I have one.
8        Q.    Are these lions fed a diet in accordance
9   with that written plan?
10       A.    Yes, they are.
11       Q.    Do you or your staff monitor the big cats
12  at your zoo using any kind of body condition
13  guidelines?
14       A.    Yes, we do.  And my vet is here every
15  week like I told you.
16       Q.    What guidelines are those?
17       A.    You know what, this is getting completely
18  ridiculous.  Because I have already told you guys
19  I'm not sharing my years and years of hard work and
20  research with PETA to put in a public record.  Let
21  someone else spend the money to develop their diets
22  and their plans.  You guys have already requested
23  this from the United States Department of
24  Agriculture.  So sitting here trying to stump me
25  with your stupid questions isn't going to work
```

1    because this is why I will leave.
2         Q.    Mr. Lowe, I'm not trying to stump you.
3         A.    Yes, you're throwing out stupid
4    questions, Asher.
5         Q.    Excuse me.  Don't interrupt me.
6         A.    I will.  Don't f■cking do that, dude.  I
7    will get up and leave.  Tim Stark, I know there's a
8    big smile on your face because you have seen this
9    s■it happen before.  Asher, don't tell me what to
10   do.  I'll turn this phone off just like that.
11        Q.    You testified that four lions from WIN
12   are at your facility.  Those big cats are the
13   subject of this litigation.  I'm obviously entitled
14   to ask about the conditions under which those lions
15   live.
16        A.    What does that have to do with my other
17   cats that you're asking about?
18        Q.    Who just spoke?
19        A.    None of your f■cking business.  I don't
20   ask you who is speaking in the room behind you.
21        Q.    I would like to remind you that you're
22   the one under oath here.
23        A.    I don't give a s■it, Asher.  I'm also the
24   one who is in control as always.  I will get up and
25   leave.  You can compel my testimony.  They'll put

1   sanctions on me, and I have no assets deliberately
2   so you'll never get anything from me.  You want to
3   keep playing this game over and over, or do you want
4   the information to take out an animal abusing
5   a■shole like Tim Stark.  You decide.  I can either
6   help you or I can completely f■ck your day up.  It's
7   up to you.
8               MR. CULOTTA:  I just want to note -- this
9   is Clay Culotta.  I just want to note for the record
10  that to the extent --
11              THE WITNESS:  He's not an a■shole, is
12  that what you're going to say, Clay?
13              MR. CULOTTA:  I'm only going to say this:
14  To the extent that if there's any kind of collusion
15  or any other kind of activity between Mr. Lowe and
16  PETA, I would like to know what communications there
17  have been and what --
18              THE WITNESS:  They reached out to me --
19              MR. CULOTTA:  -- quid pro quo has been
20  offered.
21              THE WITNESS:  All the time they reach out
22  to me, and you are never included in the emails, and
23  I brought it to their attention several times.  And
24  I've also questioned as to why Tim Stark didn't
25  receive these communications.  Haven't I?

1     Q.    Is there a specific level of knowledge or
2    qualification that someone working at your zoo needs
3    to be on the big cat crew?
4     A.    Yes, they have to be trained.  And this
5    has nothing to do -- I'm -- you're dangerously close
6    to me walking away.
7     Q.    For how long do they have to be trained?
8     A.    All right.  I'm leaving.  See you later,
9    guys.  Bye, Tim.
10                   (Whereupon, Jeff Lowe
11                    disconnected from the ZOOM
12                    deposition at 10:03 a.m.)
13          MR. SMITH:  This is Asher Smith.  I'd
14    like to note for the record that Jeff Lowe appears
15    to have just hung up and left the deposition while
16    it is still on the record and it had been ongoing
17    for approximately an hour.  We're going to take a
18    break and go off the record right now and determine
19    how and if we want to reconvene.  Thank you.
20                   (Whereupon, a break in the
21                    proceedings was taken.)
22          MR. SMITH:  This is Asher Smith.  I'd
23    just like to add for the record that counsel for
24    PETA consulted with chambers for Magistrate Judge
25    Lynch.  The Court requested that we establish for

Page 51

1  the record what occurred.  Mr. Lowe hung up and left
2  the deposition after slightly under an hour on the
3  record after I asked him about the training
4  undertaken by staff at his facility that cared for
5  the four lions taken from WIN.
6           We will not be closing the
7  deposition, and we will be filing a motion with the
8  Court to compel Mr. Lowe to complete this
9  deposition.
10          With that, we can go off the record
11 for the rest of the day.
12          (Off the record at 11:04 a.m.)