Page 1

```
1        IN THE UNITED STATES DISTRICT COURT
2        FOR THE SOUTHERN DISTRICT OF INDIANA
3
   PEOPLE OF THE ETHICAL     )
4  TREATMENT OF ANIMALS,     )
   INC.,                     )
5                            )
            Plaintiffs,      )  No. 4:17-CV-00186-RLY-DML
6                            )
       vs                    )
7                            )
   WILDLIFE IN NEED AND      )
8  WILDLIFE IN DEED, INC.,   )
   TIMOTHY L. STARK,         )
9  MELISA D. STARK AND       )
   JEFF LOWE,                )
10                           )
            Defendants.      )
11
12
13      The ZOOM VIDEOCONFERENCE deposition of
14                 LAUREN LOWE
15 called for examination pursuant to notice and
16 pursuant to the Federal Rules of Civil Procedure for
17 the United States District Courts pertaining to the
18 taking of depositions taken before JO ANN LOSOYA,
19 Certified Shorthand Reporter, within and for the
20 County of Cook and State of Illinois via ZOOM
21 VIDEOCONFERENCE on June 15, 2020 at the hour of 9:00
22 a.m. CST.
23
24
25
```

MOTION TO ENFORCE - EXHIBIT 6

```
 1    APPEARANCES VIA ZOOM/AUDIO CONFERENCE:
 2         PETA FOUNDATION
           MR. ASHER SMITH
 3         MR. GABRIEL WALTERS
           MS. CAITLIN HAWKS
 4         MS. BRITTANY PEET
           1536 16th Street NW
 5         Washington DC 20036
           (202) 483-7382
 6         ashers@petaf.org
           Gabew@petaf.org
 7         caitlinh@petaf.org
 8         BARNES & THORNBURG, LLP
           MR. PAUL OLSZOWKA
 9         One North Wacker Drive
           Suite 4400
10         Chicago,Illinois  60606
           (312) 357-1313
11         paul.olszowka@btlaw.com
                Appeared on behalf of PETA.
12
                   * * * * * * * * * * * * * * * *
13
      APPEARING NON-VIDEO:
14
           CULOTTA LAW
15         MR. JAMES CLAYTON CULOTTA
           815 East Market Street
16         New Albany, Indiana 47150
           (812) 941-8886,
17         clay@culottalaw.com
                Appeared on behalf of the Defendant
18              Wildlife in Need and Wildlife in Deed;
                Tim Stark.
19
                   * * * * * * * * * * * * * * * *
20
      ALSO PRESENT VIA ZOOM NON-VIDEO PARTICIPANTS:
21
           Mr. Tim Stark
22         Mr. Tim Tupiak, Video Tech.
23
      REPORTED BY:  JO ANN LOSOYA
24    CSR LICENSE:  084-002437
25
```

Page 3

1                          EXAMINATION

2    Witness                              Page      Line

3    LAUREN LOWE

4     By Mr. Smith                          4         7

5

6                      * * * * * * * * * * * * * * *

7                      E  X  H  I  B  I  T  S

8

9                  (No exhibits marked.)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          (Witness sworn at 9:05 a.m.)

2    WHEREUPON:

3                    LAUREN LOWE,

4    called as a witness herein, having been first duly

5    sworn, was examined and testified as follows:

6                 E X A M I N A T I O N

7    BY MR. SMITH:

8         Q.    My name is Asher Smith.  I am litigation

9    manager with the PETA Foundation and Counsel for

10   People for the Ethical Treatment of Animals, and I'm

11   here today to conduct the deposition of Lauren Lowe

12   pursuant to a subpoena to testify.  The subpoena

13   required the deponent to be available either via

14   internet-based video teleconferencing or by

15   telephone if internet service is not available.

16                It is PETA's position that the

17   deponent in order to comply with the subpoena needs

18   to be able to access the exhibits, either via video

19   or by email, and it is PETA's position the deponent

20   is not currently complying with the subpoena.

21                That said, we will continue to move

22   forward, and if it poses an issue, we would reserve

23   the right to pause the deposition and seek an order

24   from the court.

25                That said, Lauren, I understand that

Page 5

1   you were present during your husband's May 27, 2020

2   deposition before he hung up on the proceedings.

3   Nevertheless, I want to remind you of a couple of

4   quick ground rules.

5                  Please speak clearly for the court

6   reporter, especially because you are --

7        A.    I'm sorry, but you're making an

8   assumption.  I'm just going to interrupt you there.

9   You're making an assumption.  You think I was there

10  the whole time.

11       Q.    Were you present during your husband's

12  deposition?

13       A.    You're making an assumption that I was

14  there the whole time.

15       Q.    I just asked you a question.  Were you

16  present during your husband's deposition?

17       A.    And I made my answer.

18       Q.    I asked you a yes or no question.  Were

19  you present during your husband's deposition?

20       A.    No.  You didn't ask me a yes or no

21  question.  You said I was, and I'm telling you I was

22  only there part time.

23       Q.    Correct me.  Were you present during your

24  husband's deposition?

25       A.    Okay.  Next question.

Page 6

1    Q.    Were you present --

2    A.    Until my daughter starts crying, I'm

3  going to end this because you -- this is wasting my

4  time for $40.

5    Q.    Were you present during your husband's

6  deposition?

7    A.    Godd mn, not the whole thing.

8    Q.    For which portions of your husband's

9  deposition were you present?

10    A.    I don't remember.  You were there.

11    Q.    The deposition lasted under an hour and

12  was conducted via video.  Were you there for the

13  beginning of the deposition?

14    A.    I don't remember.  My daughter is a

15  little bit more important than this.

16    Q.    Can we go off the record for two seconds?

17    A.    No, we cannot.  Let's stay on record.

18  Keep going.  Like I said, my daughter is going to

19  start crying here in a minute.

20    Q.    Ms. Lowe, under Federal Rules of Civil

21  Procedure 30 --

22    A.    It is actually Mrs. Lowe.  Please make

23  sure you say it correctly.

24    Q.    I'm happy to refer to you however you

25  like me to do so.

1       A.     Mrs. Lowe.

2       Q.     Mrs. Lowe, under Federal Rule of Civil

3    Procedure 30, PETA is entitled to at least 7 hours

4    of testimony on the record.  I hope to not need

5    it --

6       A.     That's actually not what your paper says.

7    And as I have the compensation, I'm a free American

8    and this is a civil case that I am not part of.  You

9    are trying to get information from me that I am not

10   a claimant to.  So unless you are trying to put me

11   in this for absolutely no reason, then this is not

12   any reason to do this other than to harass me.

13      Q.     Okay.  Mrs. Lowe, if you don't let me ask

14   questions, if you continue to interrupt me, and if

15   you continue to threaten to leave this deposition,

16   we're going to pause the deposition, move to compel

17   your participation, and also move for our fees and

18   costs.

19      A.     Good for you.  That will save me two

20   hours today.

21      Q.     As I was saying, per the Federal Rules of

22   Civil Procedure, this deposition is not over until I

23   state on the record that it is.

24      A.     Oh, it's actually over when I say it's

25   over.  Like I said, my family comes first.  PS, it

Page 8

1   is the last thing on my list.

2        Q.    I'm simply telling you what is in the

3   Federal Rules of Civil Procedure.

4        A.    No.  Okay.  You're going to have a really

5   hard time with me, Asher, if you don't start

6   cooperating with me.  Didn't you mother ever tell

7   you not to mess with a red head.

8        Q.    Did you review the subpoena that was sent

9   to you today under which --

10       A.    I'm actually on here right now so I did

11  not refuse the subpoena.  So -- and you didn't

12  subpoena me.  You just sent me a letter saying that

13  I had to be on this call.  Now, are we going to get

14  this started or not?

15       Q.    Did you see that the subpoena required

16  you to produce any and all records concerning --

17       A.    And I do not have any records to give

18  you.

19       Q.    Is anyone else sitting within earshot of

20  you?

21       A.    I can't hear you.  What did you say?

22       Q.    Is anyone else sitting within earshot of

23  you?

24       A.    Yeah, the reality people.  I told you

25  this is being recorded for the reality show.

1    Q.    Will they be providing you information

2    during the deposition?

3    A.    No, no one is providing me anything.

4    Q.    Do you have an official job title or a

5    role with your husband's zoo?

6    A.    Yes, it is called a wife.

7    Q.    What are your responsibilities at the

8    zoo?

9    A.    Being a wife and taking care of things.

10    Q.    What does taking "care of things" entail?

11    A.    Oh, goodness, Asher.  Getting stuff done.

12    Q.    What kind of stuff?

13    A.    Listen, this has nothing to do with me

14    and the zoo at all so my title has nothing to do

15    with what's going in this conference.  So what the

16    conference is about is because you are trying to get

17    information on my phone.  I do not have that phone

18    and I will not give you my new phone because it has

19    birth pictures of my child being born.  So this call

20    is a waste of time.

21    Q.    As you're no doubt aware, you and

22    husband's involvement in this lawsuit stems from the

23    fact that according to your husband --

24    A.    I'm sorry.  I'm sorry.  Did you say I'm

25    involved in a lawsuit?  My name is not even

1  mentioned in the lawsuit.  So are you threatening me

2  with a lawsuit?

3      Q.    Ms. Lowe, please don't interrupt me when

4  I'm asking you questions.  Okay.  You --

5      A.    No, that was what you just said to me.

6  You just said I am in a lawsuit.  So explain to me,

7  Asher, what do you mean I am in a lawsuit?

8      Q.    Only one person is providing testimony

9  during this deposition.  That is you.

10      A.    And you know what --

11      Q.    Ask any questions you want.  I am not

12  going to testify --

13      A.    If you want to be a good lawyer, then

14  start acting like a good lawyer.

15      Q.    Your husband --

16      A.    Now what do you mean I am in a lawsuit?

17  Explain that to me.

18      Q.    Your husband testified --

19      A.    Now you're threatening me.

20      Q.    Your husband testified that Mr. Stark

21  drove up to your facility with four lion cubs, sat

22  them on the ground, and said here, take care of

23  these.  So to start off --

24      A.    Okay.

25      Q.    -- is that everything remember about that

Page 11

1    incident?

2          A.    That's all I remember.

3          Q.    Do you remember how Mr. Stark transported

4    these lions to your facility?

5          A.    In a truck.

6          Q.    What kind of truck?

7          A.    In his Dodge Ram 1500 -- I'm sorry -- his

8    3500.

9          Q.    Did you see from which part of the

10   vehicle Mr. Stark took the lion cubs out of, was it

11   the front seat or the back seat or the cab?

12         A.    No, I do not.  I don't know why that's

13   even necessary to know.  It was obviously not the

14   driver's side.

15         Q.    Do you know if Mr. Stark provided any

16   kind of ventilation or temperature control for the

17   cubs during the trip?

18         A.    I would assume so since they were in a

19   truck.

20         Q.    But you do not know so?

21         A.    But see, I can't assume anything because

22   then that just makes it wrong so...

23         Q.    Did Mr. Stark say anything about the trip

24   to your facility that he took with these lion cubs?

25         A.    Nope.

Page 12

1      Q.    Your husband testified that, "I think by
2   the time I walked out there, the lions were sitting
3   on the ground in a carrier."  Do you recall that?
4      A.    Okay.  So then how would I know what side
5   of the truck they came out of?
6      Q.    Do you recall the cubs --
7      A.    That wouldn't make any sense why you
8   would ask a question like that.
9      Q.    Mrs. Lowe, this is not an argument.  This
10  is a deposition.  Answer the questions I ask.
11     A.    Well, then don't ask me stupid questions,
12  please.
13     Q.    I will ask you a number of questions that
14  I am sure you will consider stupid.  You still have
15  to answer them.
16     A.    Well, I beg to differ, but go on.
17     Q.    Do you recall the cubs sitting on the
18  ground in a carrier?
19     A.    No.  I don't recall that.  I remember
20  them being carried in.
21     Q.    By whom?
22     A.    Stark.
23     Q.    Where did he carry them to?
24     A.    My house.
25     Q.    Did the cubs remain in your house after

1   that, is that where they lived?

2       A.     Yes.

3       Q.     For how long did the cubs live in your

4   home?

5       A.     Four months until they got better.

6       Q.     What did they need to get better from?

7       A.     Because they were cubs.  They needed to

8   be taken care of.

9       Q.     I asked your husband, "Did the cubs show

10  any negative effects from their transport?"  He

11  said, "I'm not a vet.  I don't know what caused

12  their negative effects."  Do you recall --

13      A.     I cannot give you any type of health

14  information because it's protected by HIPAA.

15      Q.     Okay.  HIPAA only protects information

16  pertaining to human --

17      A.     And this is information pertaining to

18  animals.  So I'm not giving you any of the

19  information because it is protected by HIPAA.

20      Q.     Is it your testimony that there is

21  information you are not disclosing because you

22  believe it is protected by HIPAA?

23      A.     I'm not giving you any health information

24  because it is protected by HIPAA.  Now, unless you

25  want to take it up with HIPAA, then you do that

1   because it seems like you guys like to take

2   everything up with somebody, picking on everyone.

3        Q.    Did the cubs need any medical attention

4   after they arrived?

5        A.    That is being protected by HIPAA.

6        Q.    Mrs. Lowe, I can tell you with complete

7   certainty that HIPAA does not cover the medical

8   information of animals.

9        A.    I'm sorry.  You cannot give me -- are you

10  giving me legal advice?

11       Q.    I am telling you what HIPAA is.  You're

12  making a --

13       A.    Okay, it sounds more like you're giving

14  me legal advice and that's not something that a

15  lawyer like you should be doing.  Correct?

16       Q.    I am telling you that beyond of a shadow

17  of doubt, HIPAA only covers the disclosures made by

18  a physician --

19       A.    I'm sorry.  I can't talk to a PETA

20  lawyer.  You guys have a bad rep.  Next question.

21       Q.    Who was responsible for taking care of

22  these cubs when they lived in your home?

23       A.    Me and my husband.

24       Q.    Could you explain how you took care of

25  these cubs?

1      A.    Feed them, bathe them, make sure they had

2  clean bedding.

3      Q.    What did you feed them?

4      A.    KMR.  It's a kitten milk replacement.

5      Q.    For how long did you feed them KMR?

6      A.    I don't have that information on me.

7      Q.    Were they fed KMR for the entire time

8  they lived in your home?

9      A.    Yes.

10     Q.    So for months?

11     A.    I don't have that information on me, but

12  yes.

13     Q.    I'm going to read you a statement that

14  Tim Stark filed with the court in this litigation.

15  It can be found in the public docket as ECF number

16  260.

17           The document reads:  "Tim Stark would

18  like to formerly notify the court of four big cat

19  cubs born on my property, one being born on July 8,

20  2019, and three more on August 7, 2019.  Mr. Lowe

21  was on my property from July 11th through the 13th

22  and observed two lionesses that were pregnant.  He

23  gave specification instructions to have the cubs

24  pulled when born and delivered to him at 25803 North

25  County Road 3250, Wynnewood, Oklahoma, 73098.  It

Page 16

1   was reiterated to me multiple times by Mr. Lowe that

2   he was the rightful owner and that f█ck PETA and

3   f█ck that judge.  I am not part of that lawsuit and

4   they have no jurisdiction over me.  I am the legal

5   owner of those cats."

6       A.    I'm sorry.  But you're reading something

7   to me that I wasn't there for, but when did you guys

8   ever start believing Tim Stark?

9       Q.    Mr. Stark --

10      A.    You guys have said he's been lying the

11  whole time so why now believe him?

12      Q.    Mr. Stark continued:  "Following the

13  instruction of their owner, Mr. Lowe, the cubs were

14  taken to his property at 25803 North County Road

15  3250, Wynnewood, Oklahoma, 73098, on August 12,

16  2019."

17            I'd like to ask you:  Are there any

18  aspects of that statement I read that are not true?

19      A.    Well, first of all, like when did you

20  ever start believing Tim Stark and every single word

21  that came out of his mouth?  And first of all, I was

22  not there.  And, of course, we're all going to say

23  "f█ck PETA," but I'm pretty sure we didn't say "f█ck

24  the judge."  But that sounds more like a Tim Stark

25  to begin with.  Every word that comes out of his

Page 17

1   mouth is an "F" word.

2        Q.    Do you know if your husband was on

3   Mr. Stark's property from July 11 through the 13th,

4   2019?

5        A.    I don't know.

6        Q.    Do you know if your husband gave

7   instructions to have the cubs pulled when born?

8        A.    That doesn't sound like my husband to do

9   that because if we knew about that, we wouldn't have

10  been so shocked to have cubs arrive at our house.

11       Q.    Did you ask Mr. Stark why he brought the

12  cubs to your house?

13       A.    No because he just drops things off.

14       Q.    Did you ever express that shock to him?

15       A.    I don't even remember.

16       Q.    I showed your husband a Facebook post

17  from the account Jeff Negan Lowe, which he testified

18  may have been authored either by himself or by you,

19  in which he or you wrote:  "Let me show you what a

20  total dumb-ass Tim Stark is.  He lied to a Federal

21  judge by telling the judge that I instructed him to

22  pull lion cubs.  What he didn't know was that Lauren

23  recorded him talking about pulling the cubs and

24  asked me to lie to the USDA.  I also made sure to

25  text Stark about him pulling the cubs against a

1    court order."

2              Were you recording Stark?

3         A.    The federal agents have that so I no

4    longer have that recording.

5         Q.    So you were recording Tim Stark when he

6    arrived?

7         A.    No.  I was recording him at a restaurant.

8         Q.    What did he discuss at the restaurant?

9         A.    Well, I can't explain every single thing

10   I said at the restaurant.  That happened almost a

11   year ago.

12        Q.    Do you recall what he said that you

13   thought was significant enough to hand over to

14   federal investigators?

15        A.    It has everything to do with what goes on

16   in the animal industry.  That actually has nothing

17   to do with you.  So it was enough for me to hand it

18   over to the people who are more important.

19        Q.    Did Tim Stark say anything that you felt

20   was incriminating?

21        A.    It was enough for me to hand it over to

22   the federal agent.  They have it.  So I no longer

23   have the recording.

24        Q.    What did Tim Stark say that you felt was

25   incriminating?

Page 19

1    A.    I no longer have the recording.  I do not

2  remember.

3    Q.    Do you remember an approximate date on

4  which you may have made this recording?

5    A.    I just said I do not remember.

6    Q.    Was it on or around August 12, 2019?

7    A.    I do not remember.

8    Q.    Do you believe it was in August of 2019?

9    A.    I don't know.

10    Q.    How did you record Mr. Stark?

11    A.    With my phone.

12    Q.    What kind of phone?

13    A.    I don't remember.

14    Q.    When you say you no longer have this

15  recording, why do you no longer have it?

16    A.    Because the federal agents have it.

17          They do have it, Jeff.

18    Q.    Did you send them the phone in the mail?

19    A.    I don't know.  But listen, I'm going to

20  have to end this pretty soon because my daughter is

21  crying and she needs to be taken care of and I don't

22  really need to be here.

23    Q.    How do you know the federal agents have

24  the phone?

25    A.    I don't know if they still have it.

Page 20

1       Q.    Did you send it to them?

2       A.    Oh my goodness, I handed it to them.  I

3   don't know what they did with it after that.

4       Q.    How did Mr. Stark ask your husband to lie

5   to the USDA about these cubs?

6       A.    He was telling him to say that they were

7   born here.

8       Q.    Did Tim Stark say anything else about

9   these cubs?

10      A.    Did what?

11      Q.    Did Tim Stark say anything else about

12  these cubs?

13      A.    No.

14      Q.    Did your husband ever say that the cubs

15  were born on your property?

16      A.    No.

17      Q.    Do you currently have acquisition records

18  for these cubs?

19      A.    That would be my husband's deal.

20      Q.    Is your husband currently present during

21  this deposition?

22      A.    No.

23      Q.    Mr. Stark stated in the document he filed

24  with the court that "it is my understanding that

25  Mr. Lowe has now listed the cubs on his USDA

1   inventory to his inspector as having been born there

2   to a female named Samira."

3                    Is this untrue?

4        A.    I have no idea.

5        Q.    What do your acquisition records say

6   about how these cubs arrived at your facility?

7        A.    I don't have access to those.

8        Q.    Where are they kept?

9        A.    I don't have access to those.

10       Q.    Do you know where they are kept?

11       A.    It sounds like you're trying to break

12  into my facility.

13       Q.    Do you know where the records are kept?

14       A.    It sounds like you're trying to plan to

15  break into this facility.  It sounds like it.

16       Q.    Mrs. Lowe, please answer the question.

17       A.    Should I be worried?  Because it sounds

18  like you guys are trying to do that.

19       Q.    Did someone else just speak to you?

20       A.    No.  Now, are you trying to break into

21  this facility to try to steal records?

22       Q.    Where are the acquisition records kept at

23  your facility?

24       A.    Asher, you ask me this question one more

25  time and I'm giving you the same answer, and I'm

Page 22

1   going to hang up.

2        Q.    You have at this point not given an

3   answer.  Are you refusing to answer?

4        A.    I have given you an answer.  I have just

5   said I don't have access.

6        Q.    Why do you not have access?

7        A.    Next question.

8        Q.    Why do you not have access to these

9   records?

10        A.    It's not my USDA license.

11        Q.    So it would be impossible for you to

12   right now go and review --

13        A.    I'm not doing anything that I have no

14   access to.

15        Q.    Is access to these records restricted?

16        A.    Definitely from you.

17        Q.    Are they restricted from you?

18        A.    They're definitely restricted from you.

19        Q.    That was not my question.  My question

20   is --

21        A.    And that's my answer.

22        Q.    -- are you restricted from accessing

23   these records?

24        A.    I have no access to these records.  If I

25   have no access, then I have no access.  Next

Page 23

1  question, Asher.

2      Q.    What does "I have no access" mean?

3      A.    Good God, you are the dumbest lawyer I

4  have ever met.

5      Q.    In what way do you have no access?

6      A.    Literally, if you ask me that question

7  one more time, I'm going to make you famous.

8      Q.    When you say that you cannot access these

9  records, what is preventing you from accessing them?

10     A.    Okay.  Don't have a key.

11     Q.    Do you know the names of these four

12  lions?

13     A.    Possibly.

14     Q.    What are their names?

15     A.    Their names change.

16     Q.    What are their names currently?

17     A.    I don't know right now.

18     Q.    Can you tell me names that they have been

19  called by that you remember?

20     A.    Let me think.  No, I don't.

21     Q.    You don't remember any of their names

22  that they have ever been called by?

23     A.    No.  I'm sorry.

24     Q.    Do you recall that during your husband's

25  deposition you reminded him that the one lion cub

Page 24

1  died at Mr. Stark's facility before he brought it to

2  Oklahoma?

3      A.    Yeah, that's what I heard from Stark.

4      Q.    When did he say that?

5      A.    I think he either -- I think he said it

6  at dinner.  I don't know.

7            I said I think it was at dinner.

8      Q.    What dinner?

9      A.    Where you eat.

10      Q.    The same day he brought the cubs?

11      A.    No.

12      Q.    Do you recall Mr. Stark saying how or why

13  this cub died?

14      A.    Nope.

15      Q.    Are these cubs currently at your

16  facility?

17      A.    Yes.

18      Q.    Are you aware that your husband is not

19  allowed to take any actions that would violate any

20  court orders in our case pertaining to these cubs?

21      A.    That's for my husband's info.  That's not

22  for me.

23      Q.    Are you aware that the Southern District

24  of Indiana has issued an order preventing your

25  husband from allowing the transport of these cubs

Page 25

1   from your facility?

2       A.    Like I said, this has nothing to do with

3   me.  I don't know.

4       Q.    Do you know if there are any plans for

5   these cubs to be transferred from your facility?

6       A.    I'm sorry.  Can you say that again?

7       Q.    Do you know if there were any plans for

8   these cubs to be transferred from your facility?

9       A.    I don't know what's going on.  Are you

10  paying the bill?

11      Q.    Are you aware that an Oklahoma Federal

12  District Court on June 1st, 2020, issued an order

13  requiring you and your husband --

14      A.    I'm sorry.  If I remember correctly, I

15  think my husband offered you the cubs as long as you

16  paid the bill, which is $100 per cub every day, so

17  that's $400 dollar a day.  So unless you are going

18  to pay the bill, the boarding bill of them being

19  here, then we really don't have much more further

20  questions.  And it is an agister thing.  So you make

21  your choice.

22      Q.    Do you recall that your husband's zoo was

23  awarded to Big Cat Rescue in an order entered by an

24  Oklahoma Federal District Court judge on June 1st,

25  2020?

Page 26

1     A.    I don't know.  I got so much going on in

2  my head right now.  This is not my first thing of

3  thought.

4     Q.    Is it news to you that according to this

5  court order, those connected with the Greater

6  Wynnewood Development Group LLC shall vacate the

7  premises of the zoo land within 120 days of the --

8     A.    This has nothing to do -- this

9  absolutely -- doesn't really have anything to do

10  with what's going on.

11     Q.    Is that news to you?

12     A.    I'm not -- No, Asher.

13     Q.    Do you know if there are any plans to

14  transfer these lions after this order goes into

15  effect?

16     A.    Well, they're not going to get abandoned.

17  Are you paying the agister's lien?

18     Q.    Where are the lions going to go?

19     A.    Are you going to pay the agister's lien?

20     Q.    I asked you a question.  Where are the

21  lions going to go?

22     A.    That's not none of your business.

23     Q.    You have to answer the questions I ask

24  you.

25     A.    I just gave you my question answer.  It's

Page 27

1   none of your business.  And don't tell me I have to

2   answer a question.  I don't have to answer it.

3        Q.   You understand that this proceeding is

4   governed by the Federal Rules of Civil Procedure?

5        A.   Do you also understand that order out of

6   Oklahoma is federal?

7        Q.   So after the order out of the Oklahoma

8   Federal District Court takes effect and you and your

9   husband and the zoo have to vacate the premises,

10  where will these lion cubs go?

11       A.   None of your business.

12       Q.   Are you aware that these lion cubs are

13  part of the litigation that your husband is a

14  defendant in?

15       A.   Just as much as they are at the Oklahoma

16  court.

17       Q.   You understand that in order to transfer

18  these lions, your husband will have to seek leave of

19  the Southern District of Indiana?

20       A.   We'll risk it.

21            We will risk it.

22       Q.   What will you be risking?

23       A.   Your answer to your stupid questions.

24       Q.   Is it your testimony that you and your

25  husband plan to transfer these cubs from your

Page 28

1   facility regardless of existing court orders from

2   the Southern District of Indiana?

3       A.    We can't comply with both orders so we're

4   just going to pick one.  Oklahoma.

5       Q.    Will the cubs be at the new zoo that your

6   husband has represented he will be opening in

7   Thackerville, Oklahoma?

8       A.    That's none of your business.

9       Q.    Do you know if this new zoo has

10  sufficient enclosures for all the big cats currently

11  at your facility?

12      A.    That is none of your business.

13      Q.    Can you describe the enclosures in which

14  the four lions we have been discussing will be

15  housed in the new facility?

16      A.    That is none of your business.

17      Q.    Can you describe the approximate

18  dimensions of the enclosures?

19      A.    That is none of your business.

20      Q.    Do these enclosures have lockout areas?

21      A.    Until you buy a ticket, we'll talk, but

22  that's none of your business.

23      Q.    Do you know the approximate height of the

24  fencing for these enclosures?

25      A.    This is none of your business.

Page 29

1      Q.    Will these enclosures contain shelter

2  areas sufficient to contain all four lions?

3      A.    Well, we'll just say that our enclosures

4  are much better than Pat Craig's.  They're a lot

5  higher than his.  I don't know how he passes USDA

6  inspection, but you know, apparently he's your guy.

7      Q.    Are you refusing to answer?

8      A.    It's none of your business what goes on

9  at the zoo.

10     Q.    Are the four lion cubs currently housed

11 together?

12     A.    None of your business.

13     Q.    Will the four lion cubs currently be

14 housed -- will the four lion cubs currently housed

15 together be housed together at the new facility at

16 Thackerville?

17     A.    None of your business.

18     Q.    In what way is it none of our business

19 whether these four lion cubs are currently housed

20 together?

21     A.    We haven't amend those decisions yet, but

22 again, if you're going to pay the agister's lien of

23 $400 a day since they have been there, we will talk

24 some more.

25     Q.    I'm sorry.  What does an amended petition

Page 30

1  have to do with whether or not you can tell me

2  whether these four lion cubs are currently housed

3  together?

4        A.    Because it's none of your business.

5        Q.    These four lions are subject to a

6  litigation taking --

7        A.    No, actually, you have subjected me here

8  because there was supposedly a claim of me having a

9  recording.  It had nothing to do about talking about

10  lion cubs.  So unless we're going to stay on topic

11  about this recording, which should only have lasted

12  about 10 minutes, not 43 minutes, then this is

13  wasting my time because now you're just fishing for

14  information that I don't have.

15        Q.    Mrs. Lowe, the subpoena commanded you

16  appear at the time, date, and place set forth in

17  your deposition --

18        A.    And it didn't command me to stay.

19        Q.    The deposition subpoena was not limited

20  to --

21        A.    It didn't command me to stay.

22        Q.    I'm --

23        A.    So unless you are going to be very

24  nice -- be nice, Asher -- then we will talk, but

25  don't ask me stupid questions and repetitive

1    questions.  Okay.

2         Q.    Mrs. Lowe, the deposition subpoena --

3         A.    Mr. Asher.  I'm glad we know each other's

4    names.

5         Q.    The deposition subpoena under which you

6    are appearing is not limited to any specific topic.

7    I am allowed to ask you --

8         A.    Well, then how -- then how did you serve

9    me the subpoena?  Because all it said on the thing

10   was recording and this is not what this is about.

11   You are fishing.  So proper serve me.  Because you

12   have already threatened to put me in this lawsuit

13   for absolutely no purpose.

14        Q.    I have not threatened you.  I have

15   merely --

16        A.    Yes, you did.  You actually did at the

17   beginning of the call.  I have it on recording.

18        Q.    According to the deposition subpoena

19   under which you are appearing, you are commanded to

20   appear at the time, date, and place set forth to

21   testify at a deposition in this civil action.

22        A.    Okay.  So take it up.  Take it up with

23   the judge and let the judge hear actually what

24   really happened and what you said.  You have

25   threatened me to put me in a lawsuit that I am not

Page 32

1  part of.  This only was supposed to be taken about a

2  recording.  Now you are fishing for other

3  information, Asher, that doesn't pertain to me that

4  I said I had no access to.  So make up your mind.

5       Q.    I don't know where you got the idea that

6  this deposition is only about one topic, but this

7  deposition --

8       A.    Because it showed up in the -- it showed

9  up on the piece of paper saying that it was for

10  recording devices.  Now I said I don't have the

11  recording devices so honestly this conference should

12  be over.

13       Q.    I am allowed to ask you for any

14  non-privileged information --

15       A.    And I'm allowed to refuse.

16       Q.    You are not.

17       A.    Yes.  Oh, now you just told the wrong

18  person to say that I can't do something.  Asher.

19  You should know better.  Don't ever tell me no again

20  because I'll treat you wrong.

21       Q.    Let's go off the record for a moment.

22       A.    No.  Let's stay on record.  No, Asher.

23  On record.  Keep going.  You scared?

24       Q.    Excuse me.  We're going to go off the

25  record for a moment.

1    A.    No.  We're staying on record.  If we're

2  going off record, then I'm getting off the phone.

3  Make up your mind.

4    Q.    We're going to reconvene --

5    A.    No. We're staying on record.  Keep going.

6    Q.    We're going to reconvene this deposition

7  in five minutes, and I expect you to still be on the

8  line when we reconvene.

9    A.    Oh, I'm sorry.  You can't expect me to do

10  anything for you.  Got it.  So I'm going to take

11  care of my child now if you don't start asking real

12  questions because all you are doing is repeating

13  yourself and I'm sure that the people on the other

14  end are absolutely enjoying this call.

15    Q.    What is happening --

16    A.    No, stay on record or we end it.

17          You got five seconds to ask a

18  question or I hang up.

19    Q.    Do you have any intention of answering

20  any questions I ask you during this deposition?

21    A.    You are going to ask me a question about

22  a question?

23    Q.    Do you have any intention --

24    A.    Come on.

25    Q.    -- of answering questions I ask you

Page 34

1    during this deposition?

2         A.    I have already answered all of them, and

3    I keep telling you none of it is any of your

4    business.

5         Q.    Do you plan to answer all of the

6    remaining questions I have to ask you with other

7    than it is none of business?

8         A.    No, I don't plan to because I have things

9    that I need to do.  Because none of these questions

10   are related to what the piece of paper was about,

11   which was about a recording.  So unless you are

12   going to ask me questions about a recording that I

13   don't remember that I no longer have, then this call

14   is over.

15        Q.    Mrs. Lowe, I'm going to continue to ask

16   you relevant questions about the facts at issue in

17   this litigation.

18        A.    The facts at issue is what was on the

19   piece of paper of you asking me about a recording.

20   It had nothing to do about the cats that I don't

21   remember, that I don't have any information to.  You

22   are asking like for information that I don't have

23   any access to, such as any type of USDA records, by

24   which by the way you are not USDA so you will not

25   have any access to it.

1            So until then, you will probably just

2   have to get it from the USDA or something like that.

3   You will not get it from me.  I have no access to

4   it.  It's not any of my problem.  It is not my

5   information.  So we will end this.

6            You got five seconds to ask another

7   question.

8            All right, guys.  Well, great, guys.

9   It was good to have a good talk with you.  Thank you

10  so much.  I got to go take care of my child.  She's

11  screaming.  Unless you guys are going to pay for my

12  nanny, have a good day.

13                    (Exit Lauren Lowe.)

14       Q.    I have additional questions to ask you.

15            Okay.  Let the record show that

16  Lauren Lowe has hung up on this deposition after

17  approximately 40 minutes on the record.  She refused

18  to answer practically any questions I asked her

19  during the deposition stating throughout that it was

20  none of my business.  When I asked her about whether

21  the big cat cubs were suffering from any medical

22  conditions or had previously, she told me that that

23  information was protected by HIPAA.

24            We are going to now go off the record

25  for a second while I speak to my colleagues.

Page 36

1                    (Whereupon, a break in the

2                    proceedings was taken.)

3          MR. SMITH:  This is Asher Smith, counsel

4     for PETA.  I just want to state on the record that

5     PETA will not be closing the deposition.  PETA --

6     this deposition is open pending PETA filing a motion

7     with the appropriate court to compel Mrs. Lowe to

8     complete this deposition.

9                    With that, we can go off the record.

10                    (Off the record at 10:05 a.m.)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                    REPORTER CERTIFICATE

2

3          I, JO ANN LOSOYA, a Certified Shorthand

4    Reporter within and for the County of Cook and State

5    of Illinois, do hereby certify:

6                    That previous to the commencement

7    of the examination of the witness, the witness was

8    duly sworn to testify the whole truth concerning the

9    matters herein;

10                    That the foregoing deposition

11    transcript was reported stenographically by me, was

12    thereafter reduced to typewriting under my personal

13    direction and constitutes a true record of the

14    testimony given and the proceedings had;

15                    That the said deposition was taken

16    before me at the time and place specified;

17                    That I am not a relative or

18    employee or attorney or counsel, nor a relative or

19    employee of such attorney or counsel for any of the

20    parties hereto, nor interested directly or

21    indirectly in the outcome of this action.

22

23

24

25

Page 38

1           IN WITNESS WHEREOF, I do hereunto set my

2    hand this June 15, 2020.

3

4

5

6

7

8    _____

     JO ANN LOSOYA, CSR

9    C.S.R. No. 84-002437

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25